11 S.W.3d 81 (2000)
In re the ADOPTION OF: H.M.C. Plaintiff,
M.A.R. and D.M.R. Respondents,
v.
N.C. (Natural Mother) Appellant;
L.T.B. (Natural Father) Appellant;
J.B. and E.B. Appellant.
Nos. WD 56367, WD 56371 and WD 56393.
Missouri Court of Appeals, Western District.
February 8, 2000.
*84 Anita Donaldson Conboy, Nevada, for appellant N.C. (Natural Mother).
Jeffrey Leon Dull, Windsor, for appellant L.T.B. (Natural Father).
Gary Wayne Lynch, Bolivar, for appellants J.B. and E.B.
Karen Coffey Woodley, Warsaw, for plaintiff.
Mark Brandon Pilley, Warsaw, for respondents M.A.R. and D.M.R.
Before SPINDEN, P.J., LOWENSTEIN, and ULRICH, JJ.
ROBERT G. ULRICH, Judge.
N.C. ("Natural Mother'") and L.T.B. ("Natural Father") appeal the trial court's order terminating their parental rights to their minor child and entering a decree of adoption in favor of M.A.R. and D.M.R. ("Adoptive Parents") pursuant to section 453.040(5), RSMo 1994.[1] Natural Mother and Father contend that the trial court erred in terminating their parental rights because the court's decision was not supported by clear, cogent and convincing evidence that Natural Mother had willfully abandoned or willfully, substantially and continuously neglected to provide the child with necessary care and protection in that Adoptive Parents' actions prevented Natural Parents from visiting and communicating with their child and exercising their parental rights. In this consolidated appeal, Paternal Grandparents contend that the trial court erred in denying, without an evidentiary hearing, their motion to intervene in Adoptive Parents' adoption action, or alternatively, their motion to consolidate their adoption action with Adoptive Parents' action. The judgment of the trial court is affirmed.

*85 Facts
H.M.C. was born May 15, 1991, in St. Louis, Missouri, to Natural Mother and Natural Father. At the time of the child's birth, Natural Mother was unmarried and Natural Father resided in Florida. Natural Mother has a ninth grade education and both her parents were deceased at the time of the child's birth.
Natural Mother moved with the child to Sedalia, Missouri, when the child was about two months old to be near J.B. and E.B. ("Paternal Grandparents"). When the child was about seventeen months old, Natural Mother began taking the child to a state-subsidized daycare run by D.M.R. ("Adoptive Mother") in Sedalia. The child attended Adoptive Mother's daycare on a regular basis during fall and winter of 1992, ceased attending in early 1993 when the child was hospitalized for malnutrition, then returned to the daycare in the spring of 1993. In the fall of 1993, the child began staying overnight with Adoptive Mother. The overnight stays were thereafter reported by Adoptive Mother to the Division of Family Services ("DFS") caseworker who was assigned to Natural Mother's case. Upon the advice of DFS, Adoptive Mother requested and received permission from Natural Mother to authorize medical care for the child.
Natural Mother and the child moved from Sedalia to Camdenton in November 1993 where they stayed in Adoptive Parents' residence with Adoptive Father and his two teenage step-children. Adoptive Mother was still living in Sedalia and driving to Camdenton on the weekends. At some point the child returned to Sedalia with Adoptive Mother.
In December 1993, a DFS caseworker contacted Adoptive Mother wanting to speak with Natural Mother. Adoptive Mother contacted Natural Mother and informed her that the DFS caseworker was looking for her and DFS wanted to put the child in foster care. Concerned that the child would be placed in foster care, Natural Mother agreed to appointing Adoptive Parents as guardians of the child.
After living in Camdenton in Adoptive Parents home for a few weeks, Adoptive Parents drove Natural Mother back to Sedalia on December 21, 1993. Two days later, Adoptive Parents drove Natural Mother from Sedalia to Adoptive Parents' attorney's office in Camdenton to discuss the petition for appointment of guardian and conservator. Natural Mother consented to appointing Adoptive Parents as guardian and conservators of the child and the petition was filed with Natural Mother's signature on December 23, 1993. Natural Father's signature was not obtained as the child's birth certificate indicated that the father's name was unknown.
Shortly after the petition appointing Adoptive Parents as guardian and conservator of the child was filed, Adoptive Mother moved with the child to Camdenton where Adoptive Father had been residing for the previous six months.
Natural Mother had two supervised visits with the child during the month of January 1994. The following month Adoptive Mother, with the child, drove to where Natural Mother was staying in Sedalia and requested that Natural Mother sign an affidavit stating her parents were deceased. In February, a guardian ad litem was appointed and the affidavit signed by Natural Mother was filed with the Camden County court. The guardianship hearing took place in March 1994 and Adoptive Parents were thereafter appointed permanent guardians and conservators of the child. The following month Natural Mother moved to Kansas. She obtained employment at two restaurants and rented a three-bedroom apartment. During her stay in Kansas, she contacted a legal assistance organization and was informed that she was ineligible for free legal assistance based upon her income level.
During the period of December 1993 through February 1995, Adoptive Parents lived with the child in Camdenton in the house where Natural Mother had briefly *86 lived with them. Adoptive Parents moved with the child from Camdenton to Marshall in February 1995, and Adoptive Mother opened another state-licensed daycare. Adoptive Parents again moved with the child from Marshall to Warsaw in October 1995. At all times, Adoptive Parents had an unlisted telephone number.
The first guardianship status report was filed by Adoptive Parents on April 1996, a year overdue, and two months prior to the filing of their petition for adoption. The status report filed with the court contained the address of Adoptive Parents but did not contain their unlisted telephone number. None of the three subsequent annual status reports filed by Adoptive Parents included Adoptive Parents' telephone number.
After living and working in Kansas for two years, Natural Mother moved from Kansas to Arizona in March 1996. Upon the advice of an Arizona legal assistance organization, Natural Mother wrote a letter to the child and mailed it on May 8, 1996, addressed to Adoptive Parents' Camdenton address. The letter was returned marked with a Sedalia forwarding address. Natural Mother mailed a certified letter to the Sedalia forwarding address on June 12, 1996, which was later returned. Coincidentally, Natural Mother mailed the Sedalia-addressed letter on the same day Adoptive Parents filed their petition for adoption and termination of parental rights.
Temporary legal custody was transferred to Adoptive Parents on August 14, 1996. In January 1997, Natural Mother suffered a frontal lobe stroke which rendered her totally incapacitated and necessitated that she move to Maine so that her sister could care for her.
Natural Father filed a motion to intervene in Adoptive Parent's adoption action in January 1997, which was denied. The motion was later sustained after Natural Father's paternity was established by a court judgment. Natural Father's parents, Paternal Grandparents, also filed a motion to intervene, which was denied. Thereafter, Paternal Grandparents filed a petition for transfer of custody and adoption and a motion to consolidate their action with Adoptive Parents' adoption action. The court denied the motion to consolidate.
After the August 12, 1998 hearing, the trial court entered its decree of adoption in favor of Adoptive Parents, terminating the parental rights of Natural Parents based upon the court's finding that Natural Parents had willfully abandoned the child and willfully, substantially and continuously neglected to provide the child with necessary care and protection during the six month statutory period. This appeal consists of the consolidation of three separate appeals which were filed as the result of the termination of the parental rights of Natural Mother and Natural Father and the denial, without an evidentiary hearing, of Paternal Grandparents' motion to intervene and motion to consolidate their adoption action with Adoptive Parents' action.

Standard of Review
The trial court's decision to grant an adoption petition will be affirmed on appeal unless the record contains no substantial evidence to support the decision, the decision is against the weight of the evidence, or the trial court erroneously declares or applies the law. In The Matter of B.S.R., 965 S.W.2d 444, 448 (Mo.App. W.D.1998); Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). The appellate court will defer to the trial court's determination of credibility and to its resolution of conflicts in the evidence. H.W.S. v. C.T., 827 S.W.2d 237, 240 (Mo.App. E.D.1992). The facts and reasonable inferences therefrom are reviewed in the light most favorable to the trial court's order. Id. The evidence and permissible inferences favorable to the judgment are accepted as true and all contrary evidence and inferences are disregarded. Id. On appeal of a court-tried case, the appellate court defers to the *87 trial court on factual issues because it is in the better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record. In re Adoption of W.B.L., 681 S.W.2d 452, 455 (Mo. banc 1984); Rule 73.01(c)(2). As the trier of fact, the trial court has leave to believe or disbelieve all, part or none of the testimony of any witness. Id. The trial court is in an especially advantageous position to determine the intent of a parent-witness in an adoption case. In re Adoption of W.B.L., 681 S.W.2d at 455.

Natural Mother's Appeal
Natural Mother and Father contend that the trial court erred in entering a decree of adoption for Respondents which terminated their parental rights because the decision was not supported by clear, cogent, and convincing evidence that Natural Parents had abandoned the child in that Adoptive Parents' actions prevented the Natural Parents from visiting and communicating with their child and exercising their parental rights.
Section 453.040(5), RSMo 1994, authorizes the adoption of a child without the consent of a natural parent when:
[a] parent who has for a period of at least six months, for a child one year of age or older, ... immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection.
§ 453.040(5), RSMo 1994. The terms `abandoned' and `neglected' are used disjunctively and either ground, if supported by substantial evidence, will support termination of parental rights. In The Matter of B.S.R., 965 S.W.2d at 448. In its initial determination, the trial court found Natural Parents had both willfully abandoned the child and willfully, substantially and continuously neglected to provide her with necessary care and protection.
Abandonment has been defined as a willful, positive act such as deserting the child; a willful delivery of the child with intention that the severance be permanent; a voluntary and intentional relinquishment of the custody of the child to another with the intent to never again claim the rights of a parent or perform the duties of a parent. In re Adoption of Baby Boy W., 701 S.W.2d 534, 543 (Mo. App. W.D.1985). Abandonment can also occur if a parent intentionally withholds from the child without just cause or excuse the care, love, protection and presence of a parent. Id. A transfer of custody for any reason may ripen into abandonment if the absent parent foregoes the performance of the functions of a parent which demonstrate the continued intent to exercise the rights and duties of a parent. Id. Whatever the genesis for the transfer or relinquishment of custody, abandonment may result if the parent manifests the intent to abandon by subsequent conduct. Id.
When determining whether abandonment has occurred, the parent's intent, an inferred fact, is determined by considering all the evidence of the parent's conduct, both before and after the statutory period. In re Adoption of W.B.L., 681 S.W.2d at 455. Proof of intent must be shown by clear, cogent and convincing evidence. In The Matter of B.S.R., 965 S.W.2d at 449. The clear, cogent and convincing standard of proof is met when the evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true. In re Adoption of W.B.L., 681 S.W.2d at 454. This standard of proof may be met even when the court is presented contrary evidence. Id. Evidence in the record, which might have supported a different conclusion, does not necessarily demonstrate that the trial *88 court's determination is against the weight of the evidence. Id.
Adoptive Parents filed their petition for adoption of the child on June 12, 1996. Accordingly, pursuant to section 453.040(5), RSMo 1994, the relevant custodial six-month period was December 12, 1995 through June 12, 1996. During the first three months of the statutory six-month period, Natural Mother lived in Kansas, where she worked two restaurant jobs, lived in a three-bedroom apartment, and earned enough to be ineligible for free legal assistance. During the remaining three months of the statutory period, Natural Mother lived in Arizona where she worked at a fast food restaurant and gas station and rented a house. During the entire six month period, Natural Mother wrote only two letters, mailed in May and June 1996, which were both returned to her due to lack of a forwarding address. Natural Mother argues that these two letters manifested an intent to repent the abandonment. Not every gesture by a natural parent will terminate abandonment. In re Adoption of W.B.L., 681 S.W.2d at 455. These two attempts to contact the child, at best, were token efforts to reestablish the parent-child relationship by Natural Mother. The absence of mother-child contact for four years and Natural Mother's failure to attempt contact with the child except for the two letters during the four years refutes Natural Mother's contention that she repented of the willful abandonment of the child to the care of the Adoptive Parents.
Even if the two 1996 letters mailed by Natural Mother were sufficient to prevent the court's finding that Natural Mother had willfully abandoned the child during the statutory period, Natural Mother's conduct prior to the statutory period would be particularly relevant and determinative of Natural Mother's intent. Natural Mother's intent to willfully abandon the child was manifested by her voluntary relinquishment of the child to Adoptive Parents in March 1994, by her consenting to the appointment of Adoptive Parents as guardians of her child, her leaving the child with Adoptive Parents, and her subsequent move from the area to Kansas. This conduct denotes Natural Mother's willful relinquishment of custody of her child to Adoptive Parents.
During the next few years, this relinquishment of custody to Adoptive Parents, if not then willful abandonment, ripened into willful abandonment of the child. During the year in which the child resided with Adoptive Parents in their Camdenton home, Natural Mother made minimal efforts to contact her child. Natural Mother's entire alleged efforts to contact the child consist of making a few phone calls. No evidence was presented that, during the time Natural Mother knew where the child was located, she sent any type of financial support to the child or that she sent the child any birthday or holiday cards or gifts. Natural Mother made no effort to physically see the child. When asked why she did not visit the child, Natural Mother stated that she did not have a vehicle and that Adoptive Mother intimidated her. Although Natural Mother repeated several times that she did not have a vehicle to visit the child, she was able to move to Kansas and then to Arizona where she worked and performed normal life activities despite lacking a car. Her willful failure to maintain any meaningful communication and/or contact with the child evinces her intent to willfully abandon the child.
Even after Adoptive Parents moved away from Camdenton with the child and Natural Mother no longer knew where they were located, Natural Mother's effort to locate the child's presence was de minimus. She did not contact an attorney, any court, police department, state family services division, missing children's organization, or any other organization or entity to assist her to find her child. Even though Natural Mother may have been financially unable to secure an attorney's services, she made no effort to contact Adoptive *89 Parents' attorney or Adoptive Parents' relatives or former neighbors to locate the child. Natural Mother's lack of effort to locate the child shows a continued lack of interest in the child and her parental duties.
Because the foregoing discussion is dispositive of the issue of whether section 453.040(5), RSMo 1994, is satisfied, addressing the issue of willful, substantial and continuous neglect is unnecessary. The record supports the trial court's determination that Natural Mother had willfully abandoned the child by clear, cogent and convincing evidence. The trial court, therefore, did not err in terminating the parental rights of Natural Mother pursuant to section 453.040(5), RSMo 1994.

Natural Father's Appeal
Natural Father has made even less effort than Natural Mother has to contact the minor child. The record makes no indication that he ever attempted to contact or support the child, reflecting his total disinterest in the child. His excuse that he did not know the location of the child does not mitigate his failure to attempt to locate or contact the child. Even when the child was living with Natural Mother, Natural Father had virtually no contact with the child.
The record supports the trial court's determination that Natural Father had willfully abandoned the child by clear, cogent and convincing evidence. The trial court, therefore, did not err in terminating the parental rights of Natural Father pursuant to section 453.040(5), RSMo 1994.

Paternal Grandparents' Appeal
In this consolidated appeal, Paternal Grandparents contend that the trial court erred in denying, without an evidentiary hearing, their motion to intervene in Adoptive Parents' adoption action or, alternatively, their motion to consolidate their adoption action with Adoptive Parents' action because the trial court abused its discretion in that Paternal Grandparents were effectively precluded from being considered as alternative adoptive parents.
Paternal Grandparents filed a motion to intervene in Adoptive Parents' adoption action on February 4, 1998. The trial court denied the motion to intervene without an evidentiary hearing. Thereafter, they filed a petition for transfer of custody and adoption of the child on February 23, 1998. In their adoption action, Paternal Grandparents filed a motion to consolidate their adoption action with Adoptive Parents' pending adoption action. Paternal Grandparents' motion to consolidate was overruled by the trial court without an evidentiary hearing. Following the denial of their motion to consolidate, Paternal Grandparents filed a notice to take depositions in their adoption action seeking to take the depositions of Adoptive Parents. In response, Adoptive Parents filed a motion seeking a protective order to stay all discovery until after the trial date of Adoptive Parents' adoption action. The trial court, without an evidentiary hearing, entered a protective order on June 5, 1998, staying all discovery until Adoptive Parents' adoption action trial date. The trial court's order provided the court's rationale:
6. That it is the intention of the Court to hear [Adoptive Parents'] case first in order to determine whether or not to sever the natural parents' parental rights as regards to said child and, if so the suitability of [Adoptive Parents] as adoptive parents of said child.
7. That counsel for the natural father in the first-filed case has deposed the [Adoptive Parents] in that case.
8. That further discovery involving [Adoptive Parents] in this case would create an undue economic hardship on them and may be unnecessary depending upon the outcome of the first case.
Paternal Grandparents then filed a motion for rehearing on both their motions to intervene and to consolidate and asked for an evidentiary hearing before the trial *90 court. The trial court denied both motions without an evidentiary hearing. Subsequently, the trial court entered its decree of adoption granting Adoptive Parents' petition for adoption.

Motion to Intervene
Missouri Rule of Civil Procedure 52.12 allows for intervention, both by right and permissive, in an action already pending. Intervention is granted as a matter of right upon timely application provided:
(1) when a statute of this state confers an unconditional right to intervene or (2) when the applicant claims an interest relating to the property or transaction that is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
Rule 52.12(a).
Under Rule 52.12(a), Paternal Grandparents would have an unconditional right to intervene if such a right is provided by statute. Section 211.177, RSMo 1994 provides grandparents "a right to intervene in any proceeding initiated pursuant to the provisions of this chapter, in which the custody of a grandchild is in issue, unless the juvenile judge decides after considering a motion to intervene by the grandparent that such intervention is against the best interest of the child." (emphasis added) This action was brought under Chapter 453 and not Chapter 211. Section 211.447.8, RSMo 1994, declares that the court hearing an adoption petition under Chapter 453 has authority to terminate parental rights, the adjudication having the same effect as would a judgment terminating parental rights rendered under Chapter 211. Whether section 211.177, RSMo 1994, is applicable to Chapter 453 proceedings to terminate parental rights is not addressed in this opinion because, even if it is applicable, the evidence supports the decision that intervention by the grandparents "is against the best interests of the child."
Alternatively, Paternal Grandparents would have an unconditional right to intervene in a proceeding if they have an appropriate "interest" to protect. "Interest" has been defined in a child custody context as a concern, which is more than mere curiosity, or academic or sentimental desire. In the Matter of Trapp, 593 S.W.2d 193, 204 (Mo. banc 1980). One "interested" in an action is one who is concerned in the outcome or result thereof because he has a legal right which will be directly affected thereby or a legal liability which will be directly enlarged or diminished by the judgment or decree in such action. Id. The Trapp court held this "interest" does not include a mere consequential, remote or conjectural possibility of being in some manner affected by the result of the original action. Id. The "interest" must be such an immediate and direct claim upon the very subject matter of the action that the intervenor will either gain or lose by the direct operation of the judgment that may be rendered therein. Id.
Paternal Grandparents biological relationship to the child, by itself, does not constitute the necessary "interest" under Rule 52.12(a)(2), to require intervention. Paternal Grandparents have no legal right, under current Missouri caselaw, which will be directly enlarged or diminished by the adoption of their biological grandchild. Paternal Grandparents cite no Missouri cases holding that their interests as grandparents are encompassed by the Trapp definition. Notably, prior cases have applied the standards for permissive intervention declared in Rule 52.12(b).
Permissive intervention is discretionary and may only be reviewed on appeal for abuse of discretion. Meyer v. Meyer, 842 S.W.2d 184, 188 (Mo.App. E.D. 1992). Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the *91 court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said the trial court abused its discretion. State ex rel. Webster v. Lehndorff Geneva, Inc., 744 S.W.2d 801, 804 (Mo. banc 1988).
The trial court did not abuse its discretion in denying Paternal Grandparents motion to intervene because the Paternal Grandparents' interest was not sufficient to warrant permissive intervention in this case. The Paternal Grandparents played no role in the child's life nor had they attempted to locate or contact the child from the time the child was an infant until after the Adoptive Parents' adoption petition was filed. In order for Paternal Grandparents to qualify for adoption, the child would have to be removed from the Adoptive Parents' custody and placed with Paternal Grandparents for at least six months. § 453.080, RSMo 1994. Without some indication that Adoptive Parents would be unsuitable, the best interests of the child would not be served by the child being removed from the only family the child has known for over four years. Accordingly, the trial court did not abuse its discretion in denying Paternal Grandparents' motion to intervene.

Motion to Consolidate
The decision whether to consolidate separate proceedings lies in the discretion of the trial court. McCormick v. McCormick, 934 S.W.2d 32, 33 (Mo.App. E.D.1996); Rule 66.01. The trial court's decision will stand unless the trial court abused its discretion. Id.
Rule 66.01 governs the consolidation of civil actions. It provides:
When civil actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the civil actions; it may order all the civil actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.
Rule 66.01(b).
The trial court's denial of the Paternal Grandparents' motion to consolidate without an evidentiary hearing did not rise to the level of an abuse of discretion. The court's decision appears to be based upon the best interest of the child by preventing the child from being removed from the family she has lived with for the past four years. Preventing further turmoil and upheaval in the young child's already tumultuous life is a reasonable basis for denying the Paternal Grandparents' motion to consolidate their adoption petition. No evidence was presented that the Paternal Grandparents attempted to locate the child or made any attempt to establish a relationship with the child during the four years the child lived with Adoptive Parents. Accordingly, the trial court did not abuse its discretion in denying, without an evidentiary hearing, the Paternal Grandparents' motion to consolidate.
The judgment of the trial court is affirmed.
SPINDEN, P.J. and LOWENSTEIN, J. concur.
NOTES
[1] § 453.040(5) was renumbered as § 453.040(7) under the 1997 statutory revisions.