

# NUMBER 13-20-00011-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**GAETAN PELLETIER AND
PELLETIER MANAGEMENT
AND CONSULTING, LLC,**                                    **Appellants,**

v.

**VICTORIA AIR CONDITIONING, LTD.,**                      **Appellee.**

---

**On appeal from the 267th District Court
of De Witt County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Hinojosa, Tijerina, and Silva
Memorandum Opinion by Justice Hinojosa**

Appellee Victoria Air Conditioning, Ltd. (VAC) sued appellants Gaetan Pelletier

and Pelletier Management and Consulting, LLC (PMC) seeking to hold them liable under

an alter ego theory for the judgment debt of QI Wholesale Lumber, LLC (QI) and TexInn, LLC (TexInn). *See* TEX. BUS. ORGS. CODE ANN. §§ 21.223, 101.002(a). Pelletier and PMC filed separate counterclaims against VAC, which were later dismissed. Following a jury trial, the trial court signed a judgment in favor of VAC against Pelletier. In three issues, which we reorder, appellants argue that: (1) the trial court erred in dismissing Pelletier's counterclaims for lack of standing; (2) the trial court erred in granting VAC's traditional motion for summary judgment and dismissing PMC's counterclaims; and (3) the evidence is factually and legally insufficient to support the jury's alter ego finding.[1] We affirm.

## I. BACKGROUND

Pelletier is a member and owner of PMC, QI, and TexInn. Each limited liability company (LLC) was involved in the construction of the TexInn Hotel in Cuero, Texas. VAC was hired to provide plumbing work for the project.

### A. QI and TexInn Sue VAC

On September 23, 2016, QI and TexInn initiated the underlying litigation when they jointly sued VAC for various causes of action complaining of VAC's plumbing work on the hotel.[2] In particular, QI and TexInn alleged that they were the owners of the hotel "and the general contractors managing its construction." They further alleged that they "had a valid and enforceable contract with VAC . . . to construct the plumbing system." QI and TexInn alleged that the contract was based on their acceptance of a November 18, 2013

---

[1] We previously denied VAC's motion to dismiss PMC's appeal.

[2] QI and TexInn also sued Lloyd D. Boedeker, a VAC employee, individually. Boedeker is not a party to this appeal.

bid letter issued by VAC.

VAC answered and filed a counterclaim for breach of contract alleging that QI and TexInn failed to pay VAC for services rendered. After QI and TexInn's counsel withdrew from representation, VAC filed a motion to dismiss alleging a failure to prosecute. VAC later filed an application for default judgment on its counterclaim. The trial court granted VAC's motion to dismiss and signed a final default judgment awarding VAC $21,642.23 in damages, $14,270 in attorney's fees, and $560.49 in costs.

## B.      Pelletier Federal Litigation

On January 25, 2017, just prior to the state court default judgment, Pelletier, proceeding pro se, filed suit in federal court against VAC alleging claims similar to those initially brought by QI and TexInn. In a memorandum opinion and order, the federal district court granted VAC's motion to dismiss Pelletier's claims for lack of standing, holding that the claims belonged to the LLCs. *Pelletier v. Victoria Air Conditioning, Ltd.*, No. 6:17-CV-006, 2018 WL 1523694, at *2 (S.D. Tex. Mar. 28, 2018), *aff'd*, 780 Fed. Appx. 136 (5th Cir. 2019). In particular, the court concluded that PMC owned the premises and the improvements thereon, rejecting Pelletier's claim that he owned the hotel building individually. *Id.* The court explained that "[t]he public record for the TexInn hotel shows no ownership in [Pelletier]." *Id.* The court also found it "troubling" that Pelletier previously claimed the hotel was owned by QI and TexInn in state court. The court noted that Pelletier represented that PMC owned the hotel in deeds of trust to secure loans for the hotel's construction. *Id.* The court observed that "[i]n listening to [Pelletier's] testimony, . . . [Pelletier] was often merging himself and his own interests in a limited liability

3

company with the limited liability company itself." *Id.* at *3. The court cautioned that "[s]tatements to lenders and to courts are not taken lightly." *Id.* at *4.

The Fifth Circuit Court of Appeals affirmed the district court, explaining "Pelletier did not establish that he personally owned the hotel and he offered no other valid cause of action for his personal claim against [VAC] . . . ." *Pelletier v. Victoria Air Conditioning, Ltd.*, 780 Fed. Appx. 136, 141 (5th Cir. 2019). Therefore, the court held that "the district court did not err in its initial judgment dismissing the case for lack of standing." *Id.*

## C.    Alter Ego Suit

While the federal suit was pending, VAC engaged in post-judgment discovery, including deposing Pelletier. On January 12, 2018, VAC filed a third-party alter ego claim against Pelletier and PMC.[3] VAC alleged that Pelletier used QI and TexInn to further his individual objectives without regard to the LLCs' business concerns. VAC further alleged that Pelletier engaged in actual fraud by representing that QI and TexInn were the parties contracting with VAC and were the actual owners of the hotel.

## D.    Pelletier Counterclaims

On February 22, 2018, Pelletier filed counterclaims against VAC in the state court litigation, reviving those claims initially asserted by QI and TexInn. Specifically, Pelletier incorporated TexInn and QI's earlier petition "as if it were fully drafted in the body of this counterclaim . . . ." However, contrary to that petition, Pelletier now alleged that he owned the hotel.

VAC filed a motion to dismiss, arguing as it did in federal court that Pelletier lacked

---

[3] VAC added PMC as a defendant in an amended pleading. VAC dismissed its claim against PMC at trial.

standing to bring the claims individually. VAC relied on the public record of ownership indicating that PMC owned the premises and the improvements. VAC also relied on the federal court's prior decision on the same issue. The trial court granted VAC's motion to dismiss.

### E.    PMC Counterclaims

After Pelletier's claims were dismissed, PMC filed similar counterclaims against VAC. In particular, PMC alleged breach of contract, negligence, and fraud claims. Like QI, TexInn, and Pelletier before it, PMC asserted that a contract was formed when it accepted VAC's November 18, 2013 bid letter. PMC alleged, in the alternative, that it was a third-party beneficiary to the contract.

VAC filed a traditional motion for summary judgment seeking to dismiss each of PMC's counterclaims. VAC attached the following evidence: (1) pleadings filed by Pelletier and his LLCs; (2) VAC's November 18, 2013 bid letter; (3) affidavits from plumbers who worked on the TexInn Hotel; (4) Pelletier's deposition testimony; (5) deeds of trust for the hotel property; (6) discovery responses; and (7) an invoice issued by VAC for its work on the project. VAC maintained that its summary judgment evidence conclusively established that it did not contract with PMC or enter into a contract to which PMC was a third-party beneficiary. VAC also argued that in the absence of a contract, PMC's fraudulent inducement claim necessarily failed. Finally, VAC argued that PMC's negligence claims were barred by limitations.

PMC filed a response to VAC's motion for traditional summary judgment, supported by the following evidence: (1) Pelletier's affidavit; (2) additional invoices from

VAC for the project; (3) discovery responses; and (4) the affidavit of PMC's counsel. PMC argued that its negligence claims were not time-barred because the claims "ar[ose] out of the same transaction or occurrence" that is the basis for VAC's suit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.069. PMC argued that an oral contract existed between PMC and VAC, relying on invoices addressed to PMC. PMC further argued that it could maintain its fraud claims based on evidence of this contract.

The trial court granted VAC's motion for summary judgment in its entirety.

## F. Alter Ego Trial

The case proceeded to a jury trial on VAC's alter ego claim against Pelletier. Two witnesses testified—Pelletier and Warren Heilker, VAC's chief executive officer.

### 1. Heilker's Testimony

Heilker signed a bid letter on behalf of VAC to perform plumbing work on the TexInn Hotel project. The bid letter was addressed to Pelletier's son, Josh Pelletier and QI.[4] The letter, dated November 18, 2013, provided that VAC would "furnish a licensed Plumber to install material for the [hotel] project as per plans and specifications" at a rate of $82.05 per hour and $101.27 for overtime hours. The letter further stated that VAC would provide a weekly invoice for its services. After submitting the bid letter, Heilker recalled that Pelletier came to his office to discuss the project. Pelletier represented to Heilker that TexInn was the owner of the property and that it would be responsible for paying VAC. Pelletier claimed that he was working for TexInn. Pelletier told Heilker that QI "was the purchasing company that would buy the materials." According to Heilker,

---

[4] The bid letter references "QY Wholesale Lumber." However, both parties agree that this is intended to be a reference to QI.

Pelletier stated that TexInn and QI had financing to finish the project.

Heilker recalled that Pelletier or "somebody in his organization" instructed VAC to invoice PMC. Heilker testified that he was unaware that QI and TexInn were pass-through entities. He stated that Pelletier did not inform him that the LLCs were not capitalized, did not have employees, and were not intended to earn a profit. When asked if he would have bid on the job had he known this information, Heilker testified, "Probably not." Heilker testified that VAC's judgment against QI and TexInn remains unpaid.

### 2. Pelletier's Testimony

Pelletier stated that he was interested in finding a plumbing company for the hotel construction willing to be paid on an hourly basis. Pelletier recalled that his son Josh first contacted VAC regarding the project. As a result of Josh's communications, VAC sent the aforementioned bid letter.

Pelletier maintained that PMC owned the land for the hotel, while he owned the improvements on the land under a land lease agreement with PMC. Pelletier stated that TexInn owned the hotel business. Pelletier provided the following flow chart to demonstrate each entity's role in the project:



FLOW CHART OF OWNERSHIP PARTIES AND RESPONSIBILITES

Pelletier acknowledged that his LLCs, QI and TexInn, represented in an earlier pleading that they were owners of the TexInn Hotel. This is contrary to Pelletier's deposition testimony that QI and TexInn owned neither the property nor the business. Pelletier also acknowledged that the loans to secure construction of the hotel were taken out in the name of PMC. Pelletier testified that at the time of trial, TexInn was no longer "functioning."

Pelletier could not recall discussing PMC's role in the project with Heilker or whether he told Heilker that QI and TexInn were the owners of the hotel. Pelletier described QI and TexInn as pass-through entities. However, he did not provide this information to Heilker or anyone with VAC. Pelletier explained that TexInn was a management company that collected funds from Pelletier and PMC "to pay the bills." Neither QI nor TexInn generated income. Pelletier stated that the only time QI and TexInn had money was when Pelletier funded them so that they could pay their obligations. Pelletier confirmed that he previously testified in a deposition that he hired VAC personally and that QI and TexInn had no assets besides a bank account. Pelletier denied telling Heilker that TexInn had a construction loan to finance the project. Pelletier did not recall discussing with Heilker how VAC would be paid. Pelletier did not know who told VAC to send the invoices to PMC; however, he maintained that TexInn paid VAC. Pelletier conceded that he represented to the City of Cuero in an application for a building permit that TexInn was the owner of the hotel.

Pelletier agreed that it was his decision that QI and TexInn would not pay the judgment debt. He testified that if VAC had originally sued him individually, he would have paid the judgment. Pelletier admitted that days after VAC filed an application for a writ of garnishment on its default judgment he transferred the funds held in QI and TexInn's accounts to his personal account. Pelletier stated it was a "mistake" and an "error" for him to do so.

### 3. Jury Charge & Verdict

The sole question submitted to the jury read as follows:

Is Gaetan Pelletier responsible for the conduct of [QI] or [TexInn]?

Gaetan Pelletier is "responsible" for the conduct of [QI] or [TexInn] if—

[QI] and [TexInn] were organized and operated as mere tools or business conduits of Gaetan Pelletier; there was such unity between [QI] or [TexInn] and Gaetan Pelletier that the separateness of [QI] or [TexInn] had ceased and holding only [QI] or [TexInn] responsible would result in injustice; and Gaetan Pelletier caused [QI] or [TexInn] to be used for the purpose of perpetrating and did perpetrate an actual fraud on [VAC] primarily for the direct personal benefit of Gaetan Pelletier.

"Actual Fraud" is defined as involving dishonesty of purpose or intent to deceive. Actual fraud can consist of a material misrepresentation, concealment of material facts or the failure to disclose a material fact.

In deciding whether there was such unity between [QI] or [TexInn] and Gaetan Pelletier that the separateness of [QI] or [TexInn] had ceased, you are to consider the total dealings of [QI] and [TexInn] and Gaetan Pelletier, including—

1. the degree to which [QI] or [TexInn's] property had been kept separate from that of Gaetan Pelletier.
2. the amount of financial interest, ownership, and control Gaetan Pelletier maintained over [QI] or [TexInn]; and
3. whether [QI] or [TexInn] had been used for personal purposes of Gaetan Pelletier.

The jury answered "yes" to this sole question.

### 4.     Judgment

The trial court signed a final judgment awarding VAC $38,602.72 as damages contemplated by the earlier default judgment, $45,820 in attorney's fees as well as conditional appellate attorney's fees, and prejudgment interest in the amount of $12,663.40. Pelletier filed a motion for new trial, which was overruled by operation of law. This appeal followed.

10

## II.    PELLETIER'S COUNTERCLAIMS

In their first issue, appellants argue that the trial court erred in dismissing Pelletier's counterclaims for lack of standing.

## A.    Standard of Review & Applicable Law

"Standing is a constitutional prerequisite to suit. A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it." *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012) (citations omitted). To establish standing, a plaintiff must allege "a concrete injury . . . and a real controversy between the parties that will be resolved by the court." *Farmers Tex. Cnty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 241 (Tex. 2020) (quoting *Heckman*, 369 S.W.3d at 154); *see DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008) (citations omitted) ("For standing, a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized, actual or imminent, not hypothetical.").

"We review questions of standing de novo." *Beasley*, 598 S.W.3d at 240 (citing *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004)). In reviewing standing, we construe the pleadings in the plaintiff's favor while considering relevant evidence offered by the parties. *Id.* (citing *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018)).

## B.    Analysis

A member of an LLC does not have an interest in any property of the company. *See* TEX. BUS. ORGS. CODE ANN. § 101.106(b). Furthermore, a member of an LLC does not have standing to assert claims that belong to the company. *Sherman v. Boston*, 486

11

S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Recognizing this limitation, Pelletier bases his standing to bring his counterclaims on his purported ownership of the hotel improvements. Pelletier maintains that he possesses an ownership interest in the improvements by virtue of a land lease agreement between PMC and himself. VAC responds that the land lease agreement does not convey ownership of the improvements to Pelletier. It also argues that that the federal court's determination that PMC owned the premises and improvements thereon has preclusive effect on this issue. We agree with VAC that Pelletier is collaterally estopped from relitigating the issue of ownership.[5]

"When asserted against a party who was actually a party in the first action, the doctrine of collateral estoppel bars relitigation of fact issues that were fully and fairly litigated and that were essential to the prior judgment." *State & Cnty. Mut. Fire Ins. Co. v. Miller*, 52 S.W.3d 693, 696 (Tex. 2001) (per curiam). Collateral estoppel applies only to issues actually litigated in the prior proceeding, meaning "the issue was raised by the pleadings or otherwise submitted for determination and was determined by the fact finder." *Tenet Health Sys. Hosps. Dall., Inc. v. N. Tex. Hosp. Physicians Grp., P.A.*, 438 S.W.3d 190, 203 (Tex. App.—Dallas 2014, no pet.). Thus, a party asserting collateral estoppel must establish "that (1) the facts sought to be litigated in the second action were

---

[5] Because we conclude that the application of collateral estoppel supports the trial court's ruling, we do not address the application of res judicata, which requires among other things, a previous final determination on the merits. *Compare In re H.B.N.S.*, No. 14-05-00410-CV, 2007 WL 2034913, at *5 (Tex. App.—Houston [14th Dist.] July 17, 2007, pet. denied) (mem. op.) (explaining that "[a] decision concerning whether a party has standing is not a decision deciding the merits of a case") *with Wells Fargo Bank, N.A. v. Ballestas*, 355 S.W.3d 187, 192 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (concluding that a prior standing determination was on the merits because it was based on a determination as to ownership of the property at issue).

fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action."[6] *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 288 (Tex. 2002); (quoting *Sysco Food Svcs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994)); *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 817 (Tex. App.—Dallas 2012, no pet.).

As noted above, before bringing his counterclaims in state court, Pelletier filed a federal lawsuit raising essentially the same claims against VAC. Following an evidentiary hearing, the federal district court found that that PMC owned the hotel, rejecting Pelletier's claim that he owned the hotel individually. *Pelletier*, 2018 WL 1523694, at *2. As a result, the federal district court dismissed Pelletier's claim for lack of standing. *Id.* The ownership of the hotel improvements was fully and fairly litigated in the federal lawsuit. It was the determinative fact on which the federal district court's standing ruling was based and was essential to that ruling. Further, the parties were cast as adversaries in the federal litigation. Accordingly, we conclude that Pelletier is collaterally estopped from relitigating his ownership of the hotel. *See Wells Fargo Bank, N.A. v. Ballestas*, 355 S.W.3d 187, 193 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (concluding that dismissal of the plaintiff's previous suit for lack of standing was based on a determination that plaintiff did not own a promissory note and that the plaintiff was collaterally estopped from relitigating ownership of the promissory note in a subsequent proceeding).

---

[6] The Texas Supreme Court has determined that the standard of review for issue preclusion is the same under both the federal and state standards. *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 288 (Tex. 2002) (citing *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex. 1990)). Therefore, it has declined to decide whether state or federal collateral estoppel law governs the preclusive effect of a prior federal judgment on a subsequent state court action. *Id.*

Absent an ownership interest in the premises or property, Pelletier has not shown a concrete injury and a real controversy between the parties. *See Beasley*, 598 S.W.3d at 241. Rather, Pelletier attempts to bring claims belonging to one of his LLCs. *See Boston*, 486 S.W.3d at 94. Conducting a de novo review, we conclude that the trial court did not err in dismissing Pelletier's claims for lack of standing. *See Beasley*, 598 S.W.3d at 240. We overrule appellants' first issue.

## III.  PMC's COUNTERCLAIMS

In their second issue, appellants argue that the trial court erred in granting VAC's traditional motion for summary judgment and dismissing PMC's counterclaims.

## A.  Standard of Review

We review a trial court's granting of summary judgment de novo. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021); *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam). In a traditional motion for summary judgment, the moving party must show that no genuine dispute exists as to any material fact such that the party is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see Eagle Oil*, 619 S.W.3d at 705. "A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* at 601 (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

A defendant may obtain summary judgment by conclusively negating at least one

element of each of the plaintiff's claims or conclusively proving each element of an affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). A defendant is not required to show that the plaintiff cannot succeed on any theory conceivable to obtain summary judgment; a defendant is only required to meet the plaintiff's case as pleaded. *Via Net v. TIG Ins.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam). In other words, a defendant is not required to guess what unpleaded claims might apply and negate them. *Id.*; *see SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 355 (Tex. 1995); *Cook v. Brundidge, Fountain, Elliott & Churchill*, 533 S.W.2d 751, 759 (Tex. 1976). If a defendant meets his initial burden, then the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Kaplan v. City of Sugar Land*, 525 S.W.3d 297, 302 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Jones v. Ray Ins. Agency*, 59 S.W.3d 739, 744 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.). "We review the summary judgment record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *Eagle Oil*, 619 S.W.3d at 705; *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam).

**B. Negligence**

Appellants first argue that VAC failed to conclusively establish its limitations defense to PMC's negligence claim.

**1. Applicable Law**

Limitations is an affirmative defense and may serve as the basis for the trial court's summary judgment. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 494 (Tex. 1991);

15

*Slagle v. Prickett*, 345 S.W.3d 693, 697 (Tex. App.—El Paso 2011, no pet.). The statute of limitations on PMC's negligence claim is two years from the date the cause of action accrued. *See Dunmore v. Chicago Title Ins. Co.*, 400 S.W.3d 635, 640 (Tex. App.—Dallas 2013, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a)).

Section 16.069 of the civil practice and remedies code provides:

(a) If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required.

(b) The counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.069. This statute is intended to prevent a party from waiting until an opponent's valid claim, arising out of the same transaction or occurrence, is time-barred before asserting its own claim. *Holman St. Baptist Church v. Jefferson*, 317 S.W.3d 540, 545 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Wells v. Dotson*, 261 S.W.3d 275, 281 (Tex. App.—Tyler 2008, no pet.). For a counterclaim to arise out of the same transaction or occurrence as the original claim under § 16.069, there must be a logical relationship between the claims. *Smith v. Ferguson*, 160 S.W.3d 115, 120 (Tex. App.—Dallas 2005, pet. denied). There is a logical relationship between the claims when the essential facts on which the counterclaim is based are significantly and logically relevant to both claims. *Id.*; *see Wells*, 261 S.W.3d at 281.

### 2. Analysis

PMC does not dispute that it filed its negligence claim more than two years after the claim accrued. However, it argues that the savings clause found in § 16.069 applies

16

to its negligence claim. We disagree.

PMC's negligence cause of action complains of the quality of VAC's plumbing work at the hotel. On the other hand, VAC's suit against PMC concerns only whether PMC was the alter ego of QI and TexInn such that it could be held liable for their judgment debt. A determination of VAC's claim has no relationship to whether it committed negligence in providing plumbing services. In other words, the essential facts for PMC's counterclaim are not significantly and logically relevant to VAC's claim. Therefore, § 16.069 is inapplicable. *See Freeman v. Cherokee Water Co.*, 11 S.W.3d 480, 483 (Tex. App.—Texarkana 2000, pet. denied) (concluding that § 16.069 did not apply because counterclaims based on the alleged fraudulent execution of a deed did not logically relate to plaintiff's declaratory action to construe a fishing rights provision contained in the deed); *see also T&C Constr., Ltd. v. Brown Mech. Servs., Inc.*, No. 01-19-00041-CV, 2020 WL 3866659, at *6 (Tex. App.—Houston [1st Dist.] July 9, 2020, no pet.) (mem. op.) (concluding that § 16.069 did not apply where the claims concerned separate projects); *BCH Dev., LLC v. Lakeview Heights Addition Prop. Owners' Ass'n*, No. 05-17-01096-CV, 2019 WL 2211479, at *10 (Tex. App.—Dallas May 21, 2019, pet. denied) (mem. op.) (same where claims for violations of restrictive covenants at one location were not logically related to claims for unrelated violations at other locations).

Without the benefit of the statute's savings provision, PMC's negligence claim is untimely. Accordingly, the trial court did not err in granting summary judgment as to that claim. *See Eagle Oil*, 619 S.W.3d at 705.

## C.    Breach of Contract

Next, appellants argue that the trial court erred in granting summary judgment on PMC's breach of contract claim. VAC moved for summary judgment on the grounds that no contract between it and PMC exists.

The existence of a valid contract is an essential element to a breach of contract claim. *Purvis v. Stoney Creek Cmty. Ass'n, Inc.*, 631 S.W.3d 287, 291 (Tex. App.—Houston [14th Dist.] 2020, no pet.). "The requirements of written and oral contracts are the same and must be present for a contract to be binding." *Lloyd Walterscheid & Walterscheid Farms, LLC v. Walterscheid*, 557 S.W.3d 245, 258 (Tex. App.—Fort Worth 2018, no pet.). To establish the existence of an enforceable contract, a party must prove (1) an offer, (2) acceptance of the offer, (3) mutual assent or "meeting of the minds" regarding the subject matter and essential terms of the contract, and (4) consideration, or mutuality of obligations. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (per curiam). A contractor's bid merely constitutes an offer to contract. *See Sedona Contracting, Inc. v. Ford, Powell & Carson, Inc.*, 995 S.W.2d 192, 197 (Tex. App.—San Antonio 1999, pet. denied); *Peterson v. NCNB Tex. Nat'l Bank*, 862 S.W.2d 182, 183 (Tex. App.—Eastland 1993, no writ); *Urban Elec. Services, Inc. v. Brownwood Indep. School Dist.*, 852 S.W.2d 676, 677–78 (Tex. App.—Eastland 1993, no writ). To form a binding contract, it must appear that the party to whom the offer is made accepts the offer and communicates such acceptance to the person making the offer. *Engelman Irr. Dist. v. Shields Bros., Inc.*, 960 S.W.2d 343, 352 (Tex. App.—Corpus Christi–Edinburg 1997, no pet.); *see Tauch v. Angel, Tr. for Gobsmack Gift Tr.*, 580 S.W.3d 808, 815 (Tex. App.—

Houston [14th Dist.] 2019, pet. granted) ("An offer may be made to a specified person, in whom is created a power of acceptance."). "[A] contract with one corporation . . . is generally not a contract with any other corporate affiliates." *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007).

PMC's pleadings allege that its contract with VAC was formed by its acceptance of VAC's November 18, 2013 bid letter: "On or about November 18, 2013, VAC issued a 'Bid Letter' to PMC, proposing the rates and terms for VAC's plumbing work at the hotel. Based on VAC's representations and Bid Letter, VAC's bid was accepted and VAC was hired for the plumbing work on the project." In its summary judgment motion, VAC argued that the contents of the bid letter negated the existence of a contract with PMC. As noted above, the bid letter, signed by Heilker on behalf of VAC, was addressed to Pelletier's son, Josh Pelletier, as a representative of QI. The letter provided that VAC would "furnish a licensed Plumber to install material for the [hotel] project as per plans and specifications" at a rate of $82.05 per hour and $101.27 for overtime hours.

The bid letter demonstrates that VAC made an offer to contract with QI, which could only have been accepted by QI. *See Engelman*, 960 S.W.2d at 352. It does not demonstrate a potential contract with an affiliated LLC such as PMC.[7] *See Merrill Lynch*, 235 S.W.3d at 191. Because PMC's contract claim is premised on the bid letter, we conclude that VAC met its summary judgment burden to negate the existence of a

---

[7] We note that the evidence at trial indicates VAC believed its contractual relationship was with TexInn and QI. However, such testimony was not before the trial court when it ruled on the motion for summary judgment, and we do not consider it in our analysis. *See Blankinship v. Brown*, 399 S.W.3d 303, 309 (Tex. App.—Dallas 2013, pet. denied) (explaining that only evidence that was before the trial court at the time it ruled on summary judgment motion would be considered and explaining that "we may not consider the trial testimony in our summary judgment analysis").

19

contract with PMC. *See Fernandez*, 315 S.W.3d at 508. Therefore, the burden shifted to PMC to create a fact issue in this regard. *See Kaplan*, 525 S.W.3d at 302.

In its response, PMC relied on Pelletier's affidavit testimony. However, Pelletier testified only that VAC was hired to perform plumbing work after receipt of the bid letter. He did not say by whom. For the reasons previously mentioned, such testimony does not demonstrate a contract between PMC and VAC. PMC also relies on the fact that VAC's invoices were addressed to PMC. However, Pelletier testified in his deposition that he hired VAC personally and that he did not know why the invoices were addressed to PMC.[8] PMC provided no evidence that VAC separately offered to contract with PMC, that PMC accepted that offer, or that there was mutual assent by VAC and PMC regarding the essential terms of such a contract. *See Sonnichsen*, 221 S.W.3d at 635. Even had PMC provided evidence of a contract formed outside the confines of the bid letter, we note that VAC was not required to negate this unpleaded theory. *See Via Net*, 211 S.W.3d at 313; *SmithKline Beecham*, 903 S.W.2d at 355 ("A defendant need not . . . show that the plaintiff cannot succeed on any theory *conceivable* in order to obtain summary judgment[.]"); *Tamimi Glob. Co., Ltd v. Kellogg Brown & Root, L.L.C.*, 483 S.W.3d 678, 698 (Tex. App.— Houston [14th Dist.] 2015, no pet.) (concluding that the defendant was not required to negate unpleaded breach of contract theory to obtain summary judgment on plaintiff's breach of contract claim); *Ely v. Gen. Motors Corp.*, 927 S.W.2d 774, 782 (Tex. App.— Texarkana 1996, writ denied) (recognizing that although pleadings are not proof, they frame the issues for purposes of ruling on a summary-judgment motion); *see also Bos v.*

---

[8] The record at trial provides some context for why PMC was invoiced. But that information was not contained in the summary judgment record.

*Smith*, 556 S.W.3d 293, 306 (Tex. 2018) (upholding reversal of the judgment for the plaintiff on a defamation claim because the judgment was based on a factual theory that did not conform to the factual theory pleaded in the petition); *Rosas v. Vela*, No. 13-19-00355-CV, 2020 WL 5056526, at *6 (Tex. App.—Corpus Christi–Edinburg Aug. 27, 2020, no pet.) (mem. op.) (concluding that defendant was not required to negate unpleaded theory of negligence to obtain summary judgment on plaintiff's negligence claim).

For the foregoing reasons, we conclude that PMC failed to raise a fact issue regarding the existence of a contract between it and VAC. Therefore, the trial court did not err in granting summary judgment. *See Kaplan*, 525 S.W.3d at 302.

## D.    Third-Party Beneficiary

Appellants argue, in the alternative, that the trial court erred in dismissing PMC's third-party beneficiary claim.

"[A] person seeking to establish third-party-beneficiary status must demonstrate that the contracting parties 'intended to secure a benefit to that third party' and 'entered into the contract directly for the third party's benefit.'" *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (quoting *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam)). "It is not enough that the third party would benefit—whether directly or indirectly—from the parties' performance, or that the parties knew that the third party would benefit." *Id.* "To create a third-party beneficiary, the contracting parties must have intended to grant the third party the right to be a 'claimant' in the event of a breach." *Id.* "The contract must include 'a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party,' and any implied intent to create a third-party

21

beneficiary is insufficient." *Id.* at 103 (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). We presume that the parties contracted solely for themselves, and only a clear expression of the intent to create a third-party beneficiary can overcome that presumption. *Id.*

In its summary judgment motion, VAC argued that its bid letter contains no mention of PMC. As we note above, the bid letter establishes that any subsequent contract based on an acceptance of the bid letter would be with QI. The terms of the offer provide no expression of an intent to directly benefit PMC. We conclude that VAC met its burden to negate PMC's third-party beneficiary claim. *See Fernandez*, 315 S.W.3d at 508. Therefore, the burden shifted to PMC to create a fact issue in this regard. *See Kaplan*, 525 S.W.3d at 302.

In response, PMC argued that the invoices VAC addressed to PMC "clearly show an intent to benefit PMC." The invoices arguably establish that VAC was aware at some point that its work on the hotel might benefit PMC. However, PMC presented no evidence of a contract in which the parties unequivocally expressed an intent to directly benefit PMC. *See id.* We conclude that PMC failed to raise a fact issue as to whether it was a third-party beneficiary to a contract. *See Kaplan*, 525 S.W.3d at 302. Therefore, the trial court did not err in granting summary judgment on this claim.

## E.     Fraud

Appellants' argument concerning PMC's fraud claim is limited to the following: "VAC argued [in its motion for summary judgment] that PMC does not have a fraud claim because it was not a party to the contract or a third-party beneficiary to the contract. As

22

shown above, however, VAC proved neither as a matter of law, and PMC's cause of action should go forward." Because we have overruled appellants' challenge to the dismissal of these claims, its contingent fraud argument necessarily fails.

## F.    Summary

We conclude that the trial court did not err in granting summary judgment as to each of PMC's counterclaims. Accordingly, we overrule appellants' second issue.

## IV.    ALTER EGO

In their third issue, appellants argue that the evidence is legally and factually insufficient to support the jury's alter ego finding.

## A.    Standard of Review

Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it and disregarding contrary evidence unless a reasonable factfinder could not. *Id*. at 824. Evidence is legally insufficient to support a disputed fact finding when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id*. at 810.

"When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the challenged

finding." *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Law. Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

In the context of a jury trial, the sufficiency of the evidence is reviewed in the light of the charge submitted if no objection is made to the charge. *Green v. Dall. Cnty. Schs.*, 537 S.W.3d 501, 506 (Tex. 2017) (per curiam); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001). The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *City of Keller*, 168 S.W.3d at 819. Jurors are free to credit one witness's testimony and disbelieve another's, and appellate courts cannot overturn a jury's verdict merely because we might reach a different result. *Id.* Therefore, to give proper deference to the jury's role as factfinder, we assume that the jury resolved all conflicts of credibility in favor of its verdict, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence if a reasonable juror could have disbelieved it. *Id.*

**B.    Applicable Law**

"Disregarding the corporate structure involves two considerations: (1) the relationship between the entities, and (2) whether the entities' use of limited liability was illegitimate." *U.S. KingKing, LLC v. Precision Energy Svcs., Inc.*, 555 S.W.3d 200, 213–

24

14 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd). Thus, to pierce the corporate veil and impose liability under an alter-ego theory, the plaintiff must demonstrate (1) that the entity on which it seeks to impose liability is the alter ego of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose, that is, to perpetrate an actual fraud on the plaintiff for the defendant's direct personal benefit. *Tryco*, 390 S.W.3d at 508; *see* TEX. BUS. ORGS. CODE ANN. § 21.223(b). The principles applicable to piercing the corporate veil apply equally to limited liability companies. *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 590–91 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see* TEX. BUS. ORGS. CODE ANN. § 101.002(a) (providing that § 21.223 applies to limited liability companies and their members).

## C.    Analysis

Appellants limit their sufficiency challenge to the second element of VAC's claim—whether Pelletier caused QI or TexInn to be used for the purpose of perpetrating an actual fraud primarily for Pelletier's direct personal benefit. Specifically, appellants argue that "there is no or factually insufficient evidence of fraud." Appellants primarily rely on the traditional tort definition of fraud to support their sufficiency arguments. However, "in the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud." *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.). Rather, courts have construed the statutory term as "involv[ing] dishonesty of purpose or intent to deceive." *Tryco*, 390 S.W.3d at 508; *see TecLogistics, Inc. v. Dresser–Rand Grp., Inc.*, 527 S.W.3d 589, 598 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Therefore, we will

limit our sufficiency review accordingly.

As detailed above, the trial record provides that PMC was the owner of the hotel and the premises and that it secured financing for the construction of the hotel. Pelletier also continued to claim at trial that he owned the hotel building personally. The loans for the construction of the hotel were taken out by PMC. Pelletier testified that TexInn was a pass-through entity that collected funds from Pelletier and PMC "to pay the bills."

Pelletier provided contrary representations to Heilker on each of these points. For instance, Pelletier told Heilker that TexInn owned the hotel and that TexInn and QI secured financing for the hotel's construction. Pelletier informed Heilker that he worked for TexInn and that TexInn would be responsible paying VAC for its services. While Pelletier denied certain aspects of Heilker's testimony, the jury was free to disbelieve Pelletier, and we must presume it resolved the conflicting testimony in favor of its verdict. *See City of Keller*, 168 S.W.3d at 819. The jury could have reasonably inferred from this evidence that Pelletier intended to deceive VAC so that it would be willing to contract with LLCs that were pass-through entities with no assets. *See Dick's Last Resort of W. End, Inc. v. Mkt./Ross, Ltd.*, 273 S.W.3d 905, 912 (Tex. App.—Dallas 2008, pet. denied) (considering as evidence of actual fraud the fact that the appellants used the corporation to ensure the landlord could not recover any assets in the event that the corporation decided to vacate leased premises before the end of a ten-year lease term).

VAC also presented evidence that Pelletier transferred all of the funds in QI and TexInn's bank accounts to his personal account after he was served with an application for writ of garnishment for those two entities. These actions also constitute evidence of

26

actual fraud. *See Tryco*, 390 S.W.3d at 510 (considering, as evidence of actual fraud the fact that the owners transferred assets away from the corporation after a judgment had been entered against the corporation); *Latham*, 320 S.W.3d at 610 (holding that there was sufficient evidence to support a finding of actual fraud when, after a corporation had been threatened with a lawsuit, a shareholder dissolved the corporation and took the corporation's assets and property for himself).

For the foregoing reasons, we conclude that the evidence would enable reasonable and fair-minded people to reach the challenged finding of actual fraud. *See City of Keller*, 168 S.W.3d at 827. We further conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Bennett*, 489 S.W.3d at 66. Accordingly, we overrule appellants' third issue.

## V. CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Delivered and filed on the
6th day of January, 2022.

27